Good morning, ladies and gentlemen. We're here once again to hear the case of Mr. Belmontes, Belmontes v. Ornosky. Is that the current warden? Who is? Woodford's long gone, I think. All right. I guess it doesn't matter. It's Belmontes v. the warden. May it please the Court, Eric Multoff on behalf of Appellant Fernando Belmontes. I'd like to reserve 10 minutes of time for rebuttal, and I would like to start at the bottom line in this case. Appellant is entitled to a new penalty trial if this Court, upon weighing the evidence in aggravation in comparison to the totality of the available mitigation, concludes that its confidence in the outcome of the first penalty trial is undermined. I would like to suggest what could have occurred at a penalty trial in which the trial court let in all the evidence from both parties, in which a jury considered the evidence contained in the currently expanded record in mitigation, and also considered the prosecution's evidence of the Jerry Howard murder, such that the Jerry Howard homicide or Appellant's role in the Jerry Howard homicide was presented to the trier of fact for determination. What would the jury have heard? And I'm looking at the big picture here. My best to look at the big picture distilled from this fairly extensive record. The jury would have heard that Appellant was born into circumstances of demonstrable adversity, that he struggled with adversity throughout his life, an unregenerate bum of a father, an immature and unprepared mother, the death of his sister at age 5, childhood depression, an extended bout with apparently life-threatening rheumatic fever, a second broken home. And in the course of these struggles, Appellant's character was formed. And this character manifested itself with positive and productive conduct under structured circumstances. When he was a youth, he participated in the Sea Cadets, the Sea Scouts. He participated in Little League. He had a paper route. When he was older, in the California Youth Authority, he trained for a job in welding. He turned away from gang pressure at personal cost to himself, was in effect exiled to a fire camp where he eventually distinguished himself for responsibility and leadership. In situations of lack of structure, he deteriorated, behaved badly, and engaged in violence. When it came time for the jury to put this compendium of evidence together to come to a just decision, two things would have emerged with great clarity. The jury would have looked at the Jerry Howard evidence and say, we really did the right thing by finding that special circumstance true, because Mr. Belmonte's does very much look like a menace to society when he's out on the street. That being said, we've crossed that bridge. The mandatory minimum penalty is life without possibility of parole. The California Department of Corrections runs a very tightly structured operation. Mr. Belmonte gets some credit for the positive efforts he made in the face of adversity in his life. Therefore, he's a prime candidate for life without possibility of parole. That is our view of how the jury would weigh and evaluate the totality of the aggravation versus the totality of the mitigating evidence. One thing that the jury would have heard that it didn't have a whiff of in the first trial was any basis to any insight into appellant's character as developed over the course of his life. And we all make judgments about character in relation to people that we're close to and observe at great detail, family members, colleagues. But appellate jury, as in this case, saw very, very brief snippets of appellant's life and had no sense of the continuity from his early struggles until the time of sentencing. A mental health expert is a person who is highly trained to take the operative circumstances throughout somebody's life, the struggles that they endure, the decisions that they make, give an opinion about their core character, and then make an informed prognosis about their likely adjustment in prison for the rest of their lives. That's what the experts in this case were prepared to do as set forth in the deposition testimony of Drs. Missitt, Young, Dr. Yates, who, in fact, had evaluated Mr. Belmonte's in the youth authority, had conducted testing on him prior to the capital murder, which would have provided a very, very solid base for the other people's opinions as well. Counsel failed to get that evidence at all, much less present it to the jury. This Court has granted penalty phase relief since the last argument in this case in a number of cases where the quantum of aggravation was, by any objective standard, as great or significantly greater than present in this case, even if the Jerry Howard homicide was presented to the jury for their evaluation of appellant's role. And, moreover, in a number of those cases, relief was granted where the appellant had been conspicuously violent and assaultive while in prior custody. Appellant Stankiewicz had stabbed in the neck a fellow individual on condemned row between his first trial and his second appeal. Appellant Landrigan had committed an assault with a deadly weapon, a knife, on another inmate while he was serving a prior term for second-degree murder. And yet, in each of these cases ---- Excuse me. Did you mention Landrigan? I did. The Supreme Court just reversed that yesterday, 5-4. Were you not aware of that? I certainly wasn't, Your Honor. That is late-breaking news. Okay. Try another one. You might want to take a look at it. Now, if the parties want to file supplemental briefs, we'll give you an opportunity with respect to Landrigan. You can tell me on rebuttal, and I'll ask the State when you think about whether you want to file a supplemental brief. Well, Your Honor, when you ask a lawyer whether they'd like to file a supplemental brief, the answer is almost always yes, because there might be another few words to say here. Well, so might the other side have a few words to say about Landrigan. Fair enough, because if it's a decision of the United States Supreme Court, I figure it will feel ---- figure prominently in this Court's assessment of the case. So my most recent shepherdization of what I thought were the relevant terms that would bring really recent cases to light brought up this Court's decision in Lamb Wright as opposed to Landrigan. And there's another case with a welter of aggravation that nonetheless resulted in a penalty phase reversal. Would you put Mayfield in that same group? Let's see. I remember the capital murder in Mayfield, and I don't remember the other aggravation evidence at this point. This being a pre-80 DPA case, this Court conducts de novo review, but it is at this point, it can only conduct de novo review of the expanded record consisting of depositions and declarations and documents. It's our position that that's ample evidence for the Court to grant relief because there is substantial evidence in there. But if the Court has any doubt as to the weight to be given to the mitigating evidence, the weight to be given to the mitigating evidence, that's the province of a trier of fact who ought to be given the ---- who ought, such that appellant should be given the opportunity to present the witnesses, the background witnesses. His teacher during his year of enforced social isolation during his bout with rheumatic fever, the people who saw him, to convey his attitudes, his efforts and his struggles. Therefore, the ---- we renew that argument here that we made in the district court that there's ample evidence to grant habeas corpus relief, but if the Court has residual doubts about the weight of the mitigation in relation to the aggravation, an evidentiary hearing is essential to resolve that. Well, you really had an evidentiary hearing on declarations or affidavits, and hearings don't have to have in-person testimony. Well, Your Honor, in all the evidence you would present at an evidentiary hearing with live witnesses you presented on paper. In terms of content, that's true. In terms of events. But in terms of weight and impact and believability and cumulative effect to actually convey some of what the jury would have, might have felt if they'd had live testimony, an evidentiary hearing would certainly has a very valuable role there. Well, you have a problem with whether you settled for a hearing on affidavits. The magistrate declined to give a hearing, and that ruling wasn't appealed. And then the district judge conducted it the way the magistrate suggested, and there was no objection to that until after he issued his opinion. Your Honor, if I may, the magistrate judge set a date for the filing of motions for an evidentiary hearing. He filed a motion for an evidentiary hearing that included several issues, including penalty phase ineffective assistance. There was an extensive motion and it was filed and then refiled in conformity with the magistrate judge's orders. There can't be any doubt from the record that we were seeking an evidentiary hearing. But he denied that, right? He denied that, and it's true. And that was a nonfinal order, and so we proceeded to the next phase. And at the point where the magistrate judge issued his second recommendation, we knew that that would be the final chance to object in front of the district court, and therefore included that in the last round of objections to go. So, Your Honor, I think the last question, the first time you objected to that after the ruling was made, as I recall, and tell me if I'm wrong, but the first time you objected to the ruling was after the district judge had taken the case and conducted his hearing on affidavits and issued his ruling. Your Honor, I believe it was after the magistrate judge's second, second – okay. We're both – Your Honor, I'm sorry. We're talking past each other here. You're right. It was after the magistrate judge issued his second report and recommendation, which was after the district judge ruled on the ineffective assistance of penalty phase counsel. All right. Okay. Your Honor, I'd like to reserve 10 minutes for rebuttal. You've got 17 minutes left. Do you want to reserve 17 minutes for rebuttal? Unless the Court has particular questions now, the answer is yes. All right. May it please the Court. The prosecution's decision to seek a death penalty in this case turned on information they had acquired that Fernando Belmonte was not only responsible for the murder of Stacey McConnell, but was also responsible for the earlier execution-style murder of Jerry Howard, and the people's case in aggravation that they intended to present in the event of a penalty phase trial was the evidence of the Jerry Howard murder was going to be the sentence. Where in the record does it reflect what the basis was for the DA to seek the death penalty? Where is that documented? You could easily say, for instance, that the basis was because he was Hispanic. There's no proof of either. There is, Your Honor. There is, in the deposition of the then-District Attorney Clark Suarez, who prosecuted the case, he was asked about his basis for seeking a death penalty in this case, and he stated that the basis was the strength of his case here and the fact of the Jerry Howard case, murder. He stated that in his deposition, and that record is before the Court. And that's in the excerpts of record? That's not in the excerpts of record, but it's in the deck. It may be, but I don't think so. I don't read. But it certainly is in Mr. Suarez's deposition. There's no question. You know, the circumstances of the killing were serious. I mean, you know, I don't mean to make light of the nature of the victim's death here. But, you know, I've seen many murder cases over my career as a judge in the State Trial Court when I used to do preliminary hearings, here on the district court doing habeas death penalty cases and here at the circuit doing death penalty cases. And this type of killing, the way this death took place. Which killer are you referring to? One here. The one we're talking about. Stacey McConnell murder. Stacey McConnell. Many, many murders are of similar nature as that. Your Honor, I respectfully disagree. This was a very, very heinous murder. Ms. McConnell was murdered for no other reason than she had the bad fortune to be home when Belmonte's. Well, was there evidence of premeditation beforehand? The jury found evidence of premeditation beforehand. Did he go there with the intent to kill her? He armed himself with the metal dumbbell bar before proceeding. But the evidence showed that they thought that the parents were or that everybody was out of the house. Doesn't it show that? When they went there, they thought it was an empty house? Your Honor, yes, they went to burglarize the house. But as I said before, the issue here is the determination of why to seek the death penalty in this case. And I'm telling you that that decision was not based alone on the Stacey McConnell murder, but also of Belmonte's prior execution-style murder of Jerry Howard, which was a very horrific crime in itself. And Mr. Belmonte's lawyer, Mr. Schick, was successful in excluding that anchor of the people's proposed evidence in aggravation. And that thereby he gave Mr. Belmonte's his only realistic chance of avoiding death. So the reason it was excluded was because he tried to prove that Mr. Belmonte's was a nonviolent person. Pardon me? I said the reason it was the reason the judge had excluded it and then said he might consider it was because they said if you try to prove he's a nonviolent person, then I'll admit it. No, Your Honor, that's not exactly accurate. The reason the evidence was excluded in the first place was because the judge felt that the evidence was admitted as a basis of prior violent conduct under the California statute. The judge concluded erroneously, as it turns out, that the fact that the prior conviction had resulted in no more than a conviction of accessory after the fact was raised judicata, which prevented the prosecution from presenting the actual facts of the decision was inaccurate in light of subsequent California authority. In particular, I can point the Court to the California Supreme Court's decision in People v. Melton. But later, now this is, and this, Judge Reinhart, this is where you are accurate. Later, the judge did indicate, however, that questioning and evidence regarding the Jerry Howard murder, among other evidence of prior bad acts, would be admissible in the event that the defense sought to present any sort of opinion, testimony regarding his character. That he was a nonviolent person. Yeah, regarding his character. And Mr. Schick backed off at that point to avoid the Howard. Not only did he back off at that point, but he recognized beforehand that, and this is fully borne out in his declaration, he recognized beforehand that this sort of questioning Mr. Schick did believe that he would be able to exclude this evidence, and he was also cognizant of the fact that any questioning or any calling of experts for opinion evidence would open the door to not only cross-examination about the Jerry Howard murder, about the fact that Belmonte's. Kennedy, where does it say that, that any expert opinion would justify a different ruling or admission of a testimony? I have at the Schick declaration, or the Schick deposition at pages 551 through 557 that he would have expected prosecution to impeach expert testimony about Belmonte 's nonviolent character or prospects for good institutional adjustment with evidence regarding the details of his prior acts of violence, including the Jerry Howard murder. Well, one of the issues we're talking about is ineffective assistance of counsel. I'm not sure that the counsel's opinion of that is particularly important. I think what we need to see is what the judge said. Well, actually, what we're talking about here first is, and I'm going on Belmonte's arguments here, is that first, Mr. Schick was unreasonable in not conducting investigation and not acquiring experts to testify about Belmonte's background, about his underlying good character, his core character, however Belmonte wants to characterize it, and about his prospects for nonviolent future adjustment. Now, Mr. Schick did conduct thorough investigation and to make to the point where he had no reason to believe that further investigation along these lines of expert psychiatric testimony would be of any use. This is not the sort of case where there was little or any investigation done in preparation of a possible penalty phase trial. Mr. Schick started thinking about possible mitigating themes early on, and he actually started investigating the matter two months before the guilt phase trial began. Mr. Schick acquired as much information from the State Bar, from various defense bar organizations in regards to possible defense themes. He contacted people from Belmonte's background, his family, his friends. He even contacted the State defender at the time, who was, ironically enough, Mr. Molthoff, in regard to possible, and he did have Belmonte's tested by a psychiatrist. The psychiatrist found nothing to suggest that Belmonte's had any diagnosable mental defect, but instead that Belmonte's was very clever, that he was a good communicator, and that he probably had antisocial personality disorder. And may I add to that, Your Honor, in this case we have an extra factor here because the prosecution early on stated that it wanted to subject Belmonte's to a penalty phase or a mental state examination for penalty phase purposes. Now, Mr. Schick successfully, again, he contacted Mr. Molthoff at the State Defender's office. Mr. Molthoff advised him to fight against that. Mr. Schick obviously knew that there were prospects for presenting mental state evidence in this case, and he also knew, based on his deposition testimony, that if he had presented his own psychiatric expert testimony, that certainly would have opened the door for the prosecution to conduct its own evaluation of Belmonte's. And as I said, that investigation had already shown Mr. Schick that there was nothing really mitigating about his mental state, but that his mental state disclosed some very aggravating factors that Mr. Schick would not want to have before the jury. Okay? And in this case, Mr. Molthoff has raised, and the Court asked for briefing on recent authority since the last time we argued this case back in 2001. And he's pointed to a number of cases. In all of these cases, there was evidence of actual defects or diagnosable disorders. In this case, there is none. What Mr. Schick did consult. Kennedy. Kennedy. About Mr. Schick's, what he said, the questions were, when you were preparing for the penalty phase, did you consider using any psychiatric evidence to show mental impairment on Mr. Belmonte's part? No. Did you consider the use of any sort of mental state evidence at the penalty phase? No. And was there any specific reason why you did not consider using that kind of evidence? I can't tell you. I can't remember going through a conscious process and saying, should I develop this, and therefore, for the such and such tactical reasons, I'm not going to do it. It just wasn't something I focused on. That's correct, because after having conducted the case, I thought you said he decided deliberately not to do it. No, he didn't. He no, in fact, he did not deliberately decide not to do it. He just didn't think of it. He decided not to do it. No, no, he didn't decide not to do it. That's not right. He didn't decide he didn't correct. He did not decide not to do it. And looking back, the reason is that there was nothing to put him on notice that there might be anything. The reason he didn't think about it, nothing to put him on notice that he had any problems? Your Honor, with all respect, he's being asked to explain why he didn't do this. And his answer was, I conducted an investigation. No, his answer was, I didn't think of it. I didn't think about it, was his answer. Not, I conducted an investigation, and that led me not to do it. But, Your Honor, he does state that, that there was nothing in his investigation that would have put him on notice of this. And in this regard, I mean, he did have a psychiatric evaluation conducted, and there was nothing to suggest that there was any psychiatric problem with Belmonte's. Belmonte's argument now, let me back up. A mental state expert is not a lawyer. He's not asked to determine what will work in a penalty phase trial versus a guilt phase trial. He's asked to evaluate what's wrong, what might be wrong with a patient, with a defendant. In this case, Belmonte's is saying that an expert, I guess, should have been called to explain what was right about the defendant. And, again, this has been all thoroughly, thoroughly addressed in the exhaustive depositions and affidavits and all the other documents presented to the district court and before this Court now. And I want to differ for a moment with Mr. Malthoff's evaluations. First, he says that there's credibility determinations that need to be made here. He did not pose these as a reason for an evidentiary hearing in the district court. And, in fact, as the Court noted earlier, he didn't even – he didn't reinforce any real need for an evidentiary hearing. When the magistrate initially denied the so-called motion for evidentiary hearing, which Belmonte's concluded with, but we don't need an evidentiary hearing because the record is sufficient, the magistrate says both parties appear to believe that no evidentiary hearing is necessary and that we can resolve this issue on the record as it exists. Now, if that was erroneous, then it was incumbent upon Mr. Belmonte's at that point to do something to set the magistrate judge straight, that, no, Your Honor, you've misinterpreted what I was moving to do. Instead, Belmonte's waited for years and years in trust that he was likely going to win. When the case was finally removed from the magistrate judge several years later, Belmonte's, again, did not ask for an evidentiary hearing. He certainly didn't proffer any of his reasons that he's been doing so now. And even after he lost this very claim in the district court, he didn't even then timely move for an evidentiary hearing. The first issue he did not move for an evidentiary hearing. Kennedy, there was an evidentiary hearing, wasn't there? They did it on depositions. Yes. By an evidentiary hearing, I mean to say a live in-court presentation of evidence. Because you're exactly right. In fact, at the time, this – I came on this case early on when we were finishing up the – the depositions and so forth in the district court. And that was – our understanding was that basically we were going to have a virtual evidentiary hearing. In this regard, in fact, the parties were asked to make evidentiary objections to portions of the depositions and the other materials that they thought should not be considered. And Respondent did so in a document outlining various hearsay, other objections to those materials. But you know – Counsel, are you familiar with the Supreme Court decision yesterday in Landrigan? No. I knew – I knew that it had sort of been granted, but I did not know that an opinion had been granted. Then I won't ask my question. Okay. But I was – but I was familiar with the – good for me – with the Landrigan decision that came down on Friday. I – by sheer happenstance, I managed to grab it or whenever it came down. It was the 11th, I believe, May 11th. And again, that's a case that's nothing like this one. There was – there was real evidence of mental defects. There was real evidence in the defendant's past that had not been looked into. Mr. Schick looked into virtually every aspect of Belmonte's past that might proffer any significant evidence in aggravation. Now, the fact that he didn't present or disclose some minutia about Little League, about sea cadets, you know, with five years of exhaustive discovery in Federal habeas proceedings, it's not surprising that there is some minor aspect that was – that was not in the defendant's background that wasn't discovered under the very short circumstances and the limited resources that Mr. Schick had to deal with in preparing for the penalty phase and guilt phase trials of this case. Mr. Schick, nonetheless, did perform an extensive investigation, and I again state he sought out advice, he sought out materials to put him on notice of whatever the standard of practice at the time would even suggest might be helpful in a penalty phase trial. He conducted investigation. He interviewed all of the witnesses that he did call before they testified at trial. He did seek out the opinion of an expert, and I think I've beat that to death fairly. There's one point I would like to address. Counsel, would you comment – counsel only mentions it in passing and wasn't sure in an oral argument as to its relevance, but the Mayfield case, are you familiar with Mayfield out of our court? I believe I briefed it in my initial brief, but off the top of my head I don't recall the pertinent facts. But I do recollect it as being a case that I discussed and distinguished in my initial appellee's brief back in 2001. Maybe you can clarify one thing for me, and that is, you know, when I read the briefs and looked at what happened in the district court, I got the impression that the State didn't really – really wasn't taking issue with whether or not counsel was ineffective, that is, in his failure to conduct his investigation. But your argument here today seems to be that he was effective. That's – if that's the impression that I may have left in my briefing and – I thought the – you know, the focus of the State was on the prejudice prong. At what point was this, Your Honor? In the brief, in the recent round of briefing that we – in the original briefing before the three judges – before us. Well, as I recall in my brief, I addressed all of this evidence on both prongs of unreasonableness and prejudice, and as we did at all stages of the proceedings below in the district court. Now, the easy way out of this, of course, is on prejudice. I steadfastly maintain that Mr. Schick was not ineffective at all. In fact, his performance in this case was far better than we witnessed in any of these other cases that we see come down the pike here. But to move that aside, let's – okay, let's move to prejudice. In this case – now, Mr. Volothop suggests, well, in some of these other cases, there was – there was an accumulation of aggravating evidence that would have been even more than the combined effect of the aggravating evidence in this case of the Howard murder and of the McConnell murder and the other factors. Well, that's – that's not the proper analysis, because we know here that the jury did, in fact, find death to be an appropriate punishment based on the scant aggravation that they were given here. Additional evidence that – that Belmontes was personally responsible for this execution, Jerry Howard murder, would have made their decision a foregone conclusion and certainly would have overwhelmed whatever negligible mitigating aspect. Well, it's not really inconsistent with their theory that in a structured environment, he would have been a model citizen, let's say. It doesn't matter, really, whether he killed one or two people first. Well, in this case, the jury was given a picture that was far different from the reality  They were given a picture of this person, and again, Schick should be congratulated for having presented the case in this way, of this person who had a very tortured background, of a person who, nonetheless, was able to form decent relationships with good people and was able to redeem himself during his CYA experience. Now, this additional evidence, and therefore he might likely be a model prisoner, first of all, is not – would not have provided additional mitigating evidence over and above what the jury was already given here, but would have provided, irrespective of the Jerry Howard murder itself, an additional basis of – of abundant basis of aggravating evidence, because Mr. Schick was able to shield the jury by virtue of these percipient witnesses of all of the very bad aspects of Belmontes' background, particularly his prior – his background of prior conduct in an institutional setting, that Mr. Belmontes attempted, in the words of the report, to form a clique for Southern Chicanos, that it was affecting the camp's racial atmosphere in a negative fashion. This – that message, that very clear gang-related message would not have been lost on any reasonable juror. The fact that – that Belmontes had numerous write-ups for – for disciplinary problems in CYA, and – and even these justness inventories that – that Belmontes insists should have been presented via expert testimony would have provided further evidence that Belmontes was – did not have a good character for performance in an institutional setting, but just the opposite, and, moreover, would likely – likely had antisocial personality disorder. Now, I do recognize that there are some cases out there that, in a certain case, arguably antisocial personality disorder could be something mitigating in the fact that the defendant might have been less culpable for his crime, because I – I frankly, I can't understand the reasoning there, but I do recognize it exists, but not in this case, Belmontes. And to show you a good institutional prospect, evidence of – of antisocial personality disorder would have flown in the face of – of his attempts to present those themes very clearly, and – and, again, would have presented this gang evidence, would have presented these additional acts that Belmontes had tried to take a police officer's weapon – police officer's weapon away from him while he was resisting arrest, that Belmontes had prior – previously been arrested for selling heroin. In other words, there – there is this entire real picture of Belmontes out there that the jury did not hear about at all. And there's really little, if anything, in this mitigating evidence, even if it would have provided some minor basis for mitigation, it certainly could not overcome the avalanche of additional aggravating evidence that surely would have come in. And – and on that point, the Court should take particular note, as I said before, the – the evidence of the Jerry Howard murder was to be the core of the prosecution's case in aggravation. Mr. Schick managed to – to suppress that evidence, thereby gutting the prosecution's case in aggravation. And it's clear from the record here that the prosecutor was chomping at the bit for any opportunity to – to – to overcome that previous suppression order and to get this evidence in. There's one last point I'd like to touch on, because Mr. Malthoff raised it for the first time in rebuttal argument after the last time we appeared on this case down in Southern California, and so I didn't have a chance to address it. And that's this, that also Mr. – Mr. Schick was somehow ineffective for, I guess, not properly preparing Del Monte's mother's testimony. And this is something that Mr. Schick has also addressed. He – he recognized that the mother was not – was not a good witness, and he had interviewed her beforehand, he had spoken with her, but he nonetheless felt that it was incumbent upon him to present the mother in regard to his overall humanizing theme with the family and all that. In other words, the jury would have certainly been wondering, okay, where's the mother if he's got such a good relationship with family and friends? So there was little more that could be done with the – with the mother other than telling her how to testify, which, of course, would have been beyond the role of counsel in this case. And her testimony that she didn't believe that her son did it, by the way, also dovetailed into – although it wasn't very good, I'll be honest with you, her testimony wasn't very good, but it did dovetail in – in Mr. Schick's theme of trying to humanize him and trying to present some lingering doubt here. And in this regard, a lot of these arguments by Belmonte's are forestalled by that strategy as well, because the – the position taken throughout the entire guilt phase of this trial was, of course, that Belmonte's did not do it. He adamantly insists that he didn't do it from the very beginning. He still does, so far as I know. It would have been very unreasonable to turn around in the guilt phase and say, well, okay, he did do it, but you should forgive him because he's going to be a model prisoner or whatever, and Mr. Schick was disposed about that extensively, and he did consider that and rejected that possibility, because after having witnessed the mistakes of earlier defense attorneys presenting penalty phase cases, after reviewing all the materials at his disposal, after talking with the State Defender's Office, he realized that presenting this sort of inconsistent testimony would undercut his efforts to present his very legitimate mitigating themes in this case. Let me conclude by saying that there's – there's simply no basis for an IEC determination in this case. The record is clearly before this Court. There's – there are no additional credibility determinations to be made in this record, because neither side has ever questioned whether these witnesses would, in fact, testify in accordance with their depositions or that they were testifying truthfully. I think that the – that all the experts here were – were testifying about what they really would have testified at Belmonte's trial. The fact is, would that have made a difference? The answer is no, for all of the reasons I have set forth here today. In fact, this is not even a closed case for ineffective assistance of counsel. And with that, I will submit the case, unless the Court – I'm starting to lose my voice, as you can tell, like I was last time. And I'll submit the case unless the Court has any additional questions or any additional questions about the remaining issues. All right. Thank you, counsel. With respect to the deficient performance prong of the Strickland test, notwithstanding counsel's glowing review of trial counsel's investigation, we have objective reference points to determine what was – what counsel was obligated to investigate at the time of this trial. Enunciated in Wiggins and relying on the ABA guidelines. And counsel is obligated to draw from the following sources in conducting a penalty phase investigation. Medical history. Counsel here conducted no investigation into Petitioner's appellant's medical history. If he had, it would have revealed a major life event of a year of social ostracism based on a bout with an apparently life-threatening rheumatic fever when he was an adolescent. Next is educational history. Counsel obtained none of Mr. Belmonte's educational records, which are now contained in the record, and which would have shown his ups and downs as he was coping with depression and other things in the course of his schoolwork. Employment and training history. Counsel failed to investigate in any way appellant's employment as a youth, which is a positive characteristic as described by – as recognized by common sense and as noted by the mental state experts, which is now part of the record. Or his training history at the California Youth Authority when he was doing a very good job learning an adult skill in the form of welding. None of that was investigated or presented. The next area of investigation is family and social history. Well, here, trial counsel did a modest job of contacting the mother, two friends, and the people from the – the pastors from the M2 experience at Youth Authority. The appellant grew up in a fairly extended family, and he had a fairly extended family of inmates – inmates, in-laws – whose declarations and observations about appellant as a youth, as growing up in these very difficult situations, are contained in ER 24. And there are many more declarations there, and they're just indicating that there are many more people who were ready, available, willing, and wanting to testify on appellant's behalf than did testify that were contacted by Mr. Schick. So – Do we have to conduct a quantity test here? Does it matter how many witnesses? Your Honor, it's a – the answer to that is obviously no, because there's no magic number of witnesses. When counsel says, I've contacted 15 witnesses, I'm going to call it a day here, because counsel might be on the verge of a – of finding the really compelling witnesses about a particular aspect of his life, or counsel might be finding great redundancy. Here, counsel had contacted appellant's mother, who in principle would have been a valuable witness as to many of these major life events that appellant experienced. But he didn't ask her about any of those, and apparently didn't know about any of those. He did not ask the mother anything about appellant's reaction to the death of his younger sister when he was five years old. He didn't ask the mother anything about appellant's childhood depression in the aftermath of this. He did not ask the mother anything about the – about what's rheumatic fever and the impact it had on him. He didn't ask the mother anything about the impact of the second broken home and the mother's deterioration into – disintegration into hopeless – kind of a hopeless situation, abandoning her maternal role when he was adolescent. If counsel had undertaken the simple and frequently used tactic of taking the photographs contained in ER 18 and showing them to the mother in the course of the examination, I'm sure she would have been able to expound in a very heartfelt manner about all of these incidents throughout appellant's life and which would have conveyed to the jury these major life events. But the examination of appellant's mother was unquestionably cursory, occupying some seven and a half pages, and concluding with the – with the open-ended question, do you have anything you'd like to say on your son's behalf, the answer was yes, I know he didn't do it. When in fact there was – there were – there was 22 years of life history that she could have described that would have made much more of an impact on the jury, showing the efforts that appellant had made to be a decent person in the face of disadvantages. So as far as effective assistance of counsel, we have trial counsel conducting no examination on medical history, no on educational history, no on employment, no on training, some on family and social, and very, very cursory, extremely cursory on the juvenile correctional experience. So he's way, way – he's batting very, very poorly on the areas that the United States Supreme Court and the American Bar Association say are the area – are the clear and obligatory areas to look into, to develop. Counsel, would you respond please to the State's comment about the Howard case and the role that Mr. Schick played in effect keeping that out on that prior round? Do you agree with his approach or not? Well, the – the deficiency, if I may, in Appley's argument here is that counsel could have presented, offered to the jury – pardon me – offered to the court out of the presence of the jury a wide variety of other evidence that's presently contained in the record and obtained exactly the same type of in limine ruling as to what this would open the door to as he obtained in the trial court. And then, if he'd done an adequate examination and had this evidence at his fingertips, could have made an informed tactical decision about what to present and what not to present. That – that didn't happen because counsel failed to investigate and marshal the evidence. The trial court was eminently willing to exercise its discretion to make sure that evidence that was more prejudicial than probative would not come in, and we have a clear example of that here. Let me ask you, counsel said that the Howard murder or Belanti's involvement in the Howard murder was the – was the sort of the keystone of the prosecution's penalty phase evidence. Is that – is that correct? I mean, is that what – I mean, were they thrown a loop here by Schick's? I don't think so, Your Honor. The in limine ruling excluding the Howard evidence occurred prior to the penalty trial in the course of a preliminary – an in limine hearing. And trial count – pardon me. The district attorney's argument to the jury was that the evidence of the McConnell homicide were – was the primary, if not really only relevant, aggravating evidence because otherwise the aggravation was awash with the mitigating evidence. But certainly that was an indicator to Mr. Schick that if he tried in the penalty phase to say his client was not a violent person, that the first thing the State would have done would be to say, hey, wait a minute, we've got this execution of a crime-style killing which this person committed, and that's obviously relevant and would have a very heavy impact on the jury, would it not? Well, Your Honor, I believe that the question – I'd like the Court to ask the – I'd ask to pose the question differently, that suppose Schick had said, I want to present the strongest case I can, that Mr. Belmontes would be a good risk, a very, very positive risk for good institutional adjustment of sentence to life without parole, because that is really relevant evidence under Skipper v. South Carolina. What's the best shot I can take on that? Well, I show all of his good conduct in the youth authority, not just the sketchy part that I showed, and I get some mental state experts to examine him, to make an evaluation of his character, and to give their opinions about how he would do if sentenced to life in prison. And if – and I don't think Mr. Schick would ever have and we've never advocated that he could make a claim, a global claim, that Mr. Belmontes was a nonviolent person, because there – that's belied by the record of his conduct when he was out as a youth involved in gang activities. But we have a very different situation when it comes to penalty phase, because it only has to do with the prospect of his nonviolent conduct, with the prospect of his good institutional adjustment, with the prospect of his positive contributions to prison society, if sentenced to life without parole. What you're saying, then, is that there's no prejudice here – or that there is prejudice here because the Howard evidence would never have come in. I'm saying it's very, very likely that the trial judge who made the kind of decision he made here with respect to excluding the – excluding the evidence would have made the same decision, excluding the evidence, under relevant California Supreme Court authority, People v. Coleman, which we cited, if counsel had proffered experts to testify to Petitioner's character as demonstrated by his – by his formative experience, by the testing that was administered, and by his prior conduct in structured situations as to his future conduct in structured situations. There is a strong likelihood that it would – would have been excluded for the same reasons that the friend's interjection that he didn't believe Mr. Belmontes was a nonviolent person. Do you disagree with counsel that under California law, the judge's ruling was incorrect on excluding this evidence? In excluding the Howard evidence at the beginning? Generally, counsel accurately described the development of California law. I – what was – when you say development, do you disagree that at the time the judge was incorrect? No, at the time, that was the best view of California law. But what the judge did? Yes. That was entirely appropriate ruling given the state of California law at the time. I've lost some track of my remaining time here, but I believe I have about 4 minutes. Does that comply? Five minutes and 13 seconds. Thank you, Your Honor. Okay. The – there's an element of prejudice here that I'd like to emphasize, and it has to do with the clear investigative leads from Dr. Kavanaugh's report, which is ER-22.  In his report, he made solely for guilt phase purposes, and he found that Mr. Belmonte's was competent to stand trial, not guilty by reason of insanity, and had no diminished capacity as to felony murder. He did say that Mr. Belmonte's violence appears to be triggered by drug use and his impulse control, which may be none too good in the first instance, seems to deteriorate with drug usage. Now, that is, in effect, an invitation to inquire into these mental state characteristics of impulsivity combined with drug use, and if counsel had conducted follow-up testing in that direction, he would have found that there's an unfortunate incidence of organic brain syndrome, which is – has a – has a documented effect of rendering the people who have that condition subject to impulsive acts in unstructured situations. And conversely, people with this affliction are much more able to control themselves and to manage their behavior under fairly rigid rules. This would have been another piece of medical information that counsel could have presented to underscore the basic theme that the – that Petitioner acknowledged in his allocution to the jury, that he could not make it on the street, but that in prison he would do his best to contribute to the welfare of his fellow inmates. Could you clarify one thing for – I want to go back to the question that Judge O'Scanlan asked you about the Howard and the state of the law today and at the time of the trial. The circumstances of – so as I understand it, he pled guilty to accessory after the fact, correct? Yes. And what I thought I heard counsel say was that under California's death penalty statutes, one of the aggravating factors is, I guess, prior involvement in violent conduct or something like that, was what he said, something? There are two – two factors – three factors, circumstances of the – of the capital murder, second is prior convictions, and third is prior unadjudicated violent conduct that can be proved beyond a reasonable doubt. And so what happened here was we had a prior conviction consisting of the accessory after the fact to voluntary manslaughter. The trial court said, well, you can introduce that because that clearly comes in under Factor B. But you're – what you're suggesting is that you want to, in effect, impeach that conviction and present live evidence that this was more than merely a accessory after the fact of voluntary manslaughter, but rather it was a first degree murder. And the trial court said, that – that isn't contemplated by the California capital sentencing statute. And I don't think it's contemplated by the California capital sentencing statute today, but it certainly wasn't then. To the point that you just said earlier that today, under California law, it would not be excluded under the capital sentencing statute. Didn't you say that at that time it was improper and now – I mean, that time the ruling was proper when it was made, but now it would not be? Okay. Your Honor, that is a – I'm 110 percent sure of the answer to the first part of the question, that it was proper at the time. I listened to counsel's recitation of the cases as to whether the law has changed now, and – and I'm unable to say with the same degree of certainty that the prosecutor – prosecution can go behind a previously established verdict to prove a greater degree of crime at this point. Those circumstances that you just – this particular factor, do they have to be alleged at the outset of the – of the – when the indictment is first returned or the information? No. There's a notice provision prior to penalty trial, but it's not something that has to be charged in the – in the – So did the State here give notice that they were going to rely on the Howard – that his involvement in the murder of Howard was greater than what he pled guilty to? The record doesn't contain how that notice was given. Often, Your Honor, in the trial courts, it's – you know, it's given through an oral notice, here's what I'm going to do, it's relevant under this, and then an in limine hearing is – is convened to determine it. But I don't recall anywhere in the record that there is a formal notice of aggravation that a – Or was the State just waiting to see what – what – what Del Monte's counsel would do at the penalty phase before attempting to get into the details, what they believed was the true circumstance? I don't believe so, Your Honor. I believe that the – the issue of the – the scope of the Jerry Howard evidence was – was resolved prior to the beginning of the penalty trial, as opposed to after the defense had presented its – its evidence. Okay. Your Honor, with respect to supplemental briefing, we're at the Court's disposal here. No, go ahead. Go ahead, counsel. Unless the Court has another question, I'm going to make a request for an opportunity to submit a letter of brief within 5 days regarding the Landrigan decision. Regarding which? The Landrigan decision. Oh, yeah. Was there anything else you were going to say in your last minute? No, Your Honor. Thank you. Okay. Counsel, two questions for you. Mr. Johnson. Yeah. One, I meant to ask you when you were here whether you wished to file a supplemental brief in Landrigan. I assume you probably would like to if the – your opponent is going to. That's correct. I – I – I – can I address it this way? I'd like to be given the opportunity to read. We'll give you both an opportunity. Okay. How about 7 days? That should be enough to read one case. Your Honor, this is a little difficult, but I'm – You wouldn't know it by looking at me, but I'm in the middle of the first vacation I've taken in over 8 years right now. I've accommodated this argument to have my family with me in San Francisco today so I could take part in this argument, but I'm not going to return to my office until close to the end of the month. Don't worry. So I would ask that maybe I be given a little extra time. All right. We'll send you a notice about the dates. Okay. Thank you. One other question. Do you happen to have a citation to the record at your fingertips as to where notice was given on the – thank you. I believe I do, Your Honor. I took notice. I know that there was very extensive documentation provided – providing all of the police reports and subsequent investigations and subsequent interviews regarding the Jerry Howard murder that was provided to the defense prior to the guilt phase. And I believe if you'll just indulge me for a moment here, I think I might be able to find it in my cheat sheet. I believe it's at Respondent's – I believe it's at Respondent's Exhibit Numbers 62, 63, and 64. All right. Thank you, counsel. Is there anything else? No, thank you. Thank you, Your Honor. Thank you both. The case just argued will be submitted. The court will adjourn for the day. Hear, ye, hear. You all first things that I would ask for is that the Honorable Committee of the United States Court of Appeals, if that's perfect, will now depart. The public discussion now stands adjourned. Thank you.
judges: Reinhardt, O'scannlain, Paez